## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SHAUNA R. FOWLKES, | ) | |
| | ) | |
| Plaintiff, | ) | 7:08CV5007 |
| | ) | |
| vs. | ) | **ORDER** |
| | ) | |
| SOCIAL SECURITY ADMINISTRATION, | ) | |
| MICHAEL J. ASTRUE, Commissioner, | ) | |
| | ) | |
| Defendant. | ) | |

Shauna R. Fowlkes (Fowlkes) filed an application for disability benefits under Title II of the Social Security Act (Act), 42 U.S.C. §§ 401 *et seq.*, and supplemental security income (SSI) benefits under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, on May 26, 2005. The Social Security Administration (SSA) denied benefits initially and on reconsideration. An administrative law judge (ALJ) held hearings on July 26, 2007, and February 4, 2008. On February 15, 2008, the ALJ determined Fowlkes was not disabled within the meaning of the Act from July 31, 2003, through the date of the decision. The Appeals Council denied Fowlkes' request for review on July 18, 2008. Fowlkes now seeks judicial review of the ALJ's determination as it represents the final decision of the Commissioner of the Social Security Administration.[1]

Fowlkes filed a brief (Filing No. 18) and a reply brief (Filing No. 24) in support of this administrative appeal. The Commissioner filed the transcript of the administrative record (AR.) (Filing No. 13 (not available electronically)), and a brief (Filing No. 21) in opposition of Fowlkes' appeal for benefits. Fowlkes appeals the ALJ's decision and asks that the case be remanded for an award of benefits because the ALJ failed to accord appropriate weight to Fowlkes' mental health providers, Vivek Jain, M.D., and Ginger Brasuell, a certified Advanced Practice Registered Nurse (APRNC). **See** Filing No. 18 - Brief p. 10. This court has jurisdiction to review the final decision of the Commissioner of Social Security under 42 U.S.C. § 405(g). The court has reviewed the record, the ALJ's decision,

---

[1] The parties consented to jurisdiction by a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). **See** Filing No. 17.

the parties' briefs, the transcript, and applicable law, and finds the ALJ's ruling that Fowlkes is not disabled should be affirmed because it is supported by substantial evidence in the record.

## PROCEDURAL BACKGROUND

Fowlkes applied for disability benefits and SSI on May 26, 2005, pursuant to the Act (AR. 103-107; 354-361). Fowlkes alleged an inability to engage in any substantial and gainful work activity after July 31, 2003, due to bipolar disorder and osteoarthritis in one hip (AR. 119, 150). The SSA denied benefits initially (AR. 63-66) and on reconsideration (AR. 68-70A). Thereafter, ALJ Larry M. Donovan held hearings on July 26, 2007, and February 4, 2008 (AR. 14; 372-388; 389-412). The ALJ issued a decision on February 15, 2008 (AR. 14-28). The ALJ determined Fowlkes was not eligible for disability benefits or SSI because she was not disabled under sections 216(i) and 223(d) of the Act (AR. 28). The Appeals Council denied Fowlkes' request for review on July 18, 2008 (AR. 5-7).

## FACTUAL BACKGROUND

### A.    Medical and Personal History

Fowlkes was born on June 17, 1972, is five feet seven inches tall, and weighed approximately 170 pounds from the date of onset through the first hearing date (AR. 379, 382). Fowlkes completed two years of vocational school for cosmetology and barbering (AR. 381). Fowlkes' past relevant work consists of employment as a waitress and as a hairdresser (AR. 130). Most recently, Fowlkes worked as a classroom assistant two days or less per month (AR. 382-383). Fowlkes is not currently looking for work or registered with Job Services (AR. 383). Fowlkes lives in a two-story home with a basement (AR. 380). At the time of the hearing, Fowlkes was living with her husband and two of their children, ages 5 and 14 (AR. 380-381). Two other children ages 18 and 22 do not live in the home (AR. 381). Fowlkes does not have any biological children, but does have adopted and foster children (AR. 305). Fowlkes' husband works as an over-the-road truck driver, working away from the home three or four nights each week (AR. 381). Fowlkes alleges she became unable to work on July 31, 2003, and has had no substantial and

gainful work activity since then (AR. 20, 382). Fowlkes' allegations of disability are based on problems associated with bipolar disorder and osteoarthritis in one hip (AR. 119, 150).

### 1.   Osteoarthritis

On July 28, 2003, Fowlkes underwent surgery for a two-year old shoulder injury (AR. 285). After completion of eight to twelve weeks of physical therapy, Fowlkes was expected to have normal strength and range of motion in her shoulder (AR. 285-286). During her initial intake examination associated with the shoulder injury, Fowlkes reported she had a medical history of joint deterioration in her right hip (AR. 285).

On April 29, 2004, Fowlkes presented to Jacqueline van Egeraat, M.D., a family practitioner, with right hip pain (AR. 231). This was the first time Fowlkes had seen a doctor regarding her pain, yet she reported the pain in her hip had been ongoing for eight to nine years (AR. 231). Fowlkes was prescribed pain medication and advised to see an orthopedic surgeon (AR. 231). After Fowlkes was diagnosed with "severe osteoarthritis, bone to bone" and told she probably needed to have hip replacement surgery by an orthopedic specialist, Fowlkes saw Dr. van Egeraat on May 25, 2004, for a change in pain medication (AR. 229). Fowlkes stated the pain was severe, but she was too young for surgery (AR. 229). Dr. van Egeraat prescribed Fowlkes additional pain medication (AR. 229). In June 2004, Fowlkes sought additional pain medication and decided to see another orthopedic surgeon for a second opinion about surgery (AR. 228). Fowlkes continued to use medication for her hip pain (AR. 222). On March 8, 2005, Fowlkes reported she was delaying hip surgery for financial reasons, but sought more effective pain medication (AR. 221). In April 2005, Fowlkes reported her new medication was working "okay" for her hip pain (AR. 220). However, on May 8, 2005, Fowlkes went to the emergency room with hip pain after falling (AR. 271-272). Fowlkes was given pain medication and told to use ice and rest (AR. 271-272).

On June 6, 2005, Fowlkes underwent hip replacement surgery (AR. 191). Shortly thereafter, Fowlkes was treated for an infection in the surgical wound (AR. 191). On July 12, 2005, Fowlkes reported to Dr. van Egeraat that she was "doing fine" since her hip replacement and needed almost no pain medication (AR. 218). On July 13, 2005,

3

Fowlkes' doctor gave her permission to start bearing weight on her right leg, as tolerated (AR. 304). However, on July 30, 2005, Fowlkes injured her hip, when twisting while rising from a chair, and reported to the emergency room (AR. 264). Fowlkes was advised she should use her pain medication and rest (AR. 264). In August 2005, Fowlkes was doing "quite well" with her hip (AR. 303). Fowlkes used crutches, but could do some walking with a limp (AR. 303).

On July 13, 2007, Dr. van Egeraat completed a medical source statement (AR. 325-330). Dr. van Egeraat noted that because of Fowlkes' history of hip replacement surgery and sciatic nerve problems, Fowlkes could lift up to ten pounds frequently and eleven to 20 pounds occasionally, but could not lift more (AR. 325). Additionally, Fowlkes could occasionally carry up to ten pounds but no more (AR. 325). Fowlkes could sit, stand, or walk for a total of eight hours in a work day (AR. 326). She should never climb ladders or scaffolds, balance, stoop, kneel, crouch, or crawl; but she could occasionally climb stairs and ramps (AR. 328). She should never work around unprotected heights, humidity and wetness, or vibrations; but she could occasionally work around moving mechanical parts, dust, extreme cold and heat, or operate a motor vehicle (AR. 329). Dr. van Egeraat noted these limitations lasted or would last for twelve consecutive months (AR. 330).

## 2.    Bipolar Disorder

During 2002, Fowlkes was diagnosed with bipolar disorder and treated for depression (AR. 204; 306). On November 18, 2002, Fowlkes reported the medication Celexa was not working to control her illness and she still had problems with anger and anxiety (AR. 204). Fowlkes was then prescribed Effexor (AR. 204). In January 2003, Fowlkes' Effexor dosage was increased after she reported it was not working well (AR. 204). Fowlkes' Effexor dosage was increased again in April 2003 (AR. 203).

On November 21, 2003, Vivek Jain, M.D. conducted a psychiatric evaluation of Fowlkes for treatment (AR. 258-261). Fowlkes reported to Dr. Jain that Fowlkes' emotional problems started in high school and she has a family history of depression, alcoholism, and physical abuse (AR. 258). Fowlkes reported good relationships with her family (AR. 260). Fowlkes also reported to Dr. Jain that Effexor initially helped her symptoms but was no

4

longer effective (AR. 258).  Fowlkes reported depression, mood swings, crying episodes, and feelings of hopelessness (AR. 258).  Dr. Jain diagnosed moderate bipolar disorder, panic disorder, alcohol dependence (in partial remission), and physical abuse as a child (AR. 260).  Dr. Jain assessed Fowlkes with a GAF score of 50 (AR. 261).[2]  However, Dr. Jain noted Fowlkes suffered no homicidal or suicidal ideations (AR. 260).  Dr. Jain discussed the benefits of counseling for Fowlkes, decreased the prescription for Effexor, and prescribed Lamictal (AR. 261).  Dr. Jain met with Fowlkes monthly or as needed.  On December 29, 2003, the medication appeared to be helping Fowlkes who reported she was having more good days than bad and less intense mood swings (AR. 256).

In March 2004, Fowlkes seemed to be "doing fine" (AR. 255).  Her mood was stable and she reported having only a couple of panic attacks and crying spells (AR. 255).  However, on April 1, 2004, Fowlkes reported trouble sleeping, crying spells, and spending over $400.00 on a shopping spree at Wal-Mart (AR. 254).  She also had racing thoughts and felt extremely overwhelmed (AR. 254).  By May 2004, Fowlkes was feeling better and reported only feeling down "once in a while" (AR. 252).  She reported she continued to have trouble sleeping due to her husband's sleep apnea (AR. 252).  On June 14, 2004, Fowlkes reported her bipolar disorder was stable (AR. 251).  At that time, her medication included Lamictal, Effexor, and Seroquel (AR. 251).

On July 14, 2004, Fowlkes reported feeling depressed, anxious, and unable to sleep (AR. 250).  She reported crying spells and feelings of hopelessness and worthlessness (AR. 250).  By the end of July, Fowlkes' mood improved with a change in medication although she continued to have trouble sleeping (AR. 249).

On August 17, 2004, Dr. van Egeraat noted Fowlkes "denies any feelings of depression" during treatment for fatigue and a viral infection (AR. 225).  However, on August 26, 2004, Fowlkes reported having a "major meltdown" the previous week and felt physically sick and tired, but she was sleeping and eating well (AR. 248).  By September,

---

[2]Global assessment of functioning is the clinician's judgment of the individual's overall level of functioning, not including impairments due to physical or environmental limitations.  **See** American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders, 30-32 (4th ed. text rev. 2000) (DSM-IV-TR).  A GAF of 41 through 50 is characterized by serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job).  **See** DSM-IV-TR at 34.

she reported feeling better but continued to have compulsive shopping feelings, depressive symptoms and felt "empty" (AR. 247). On October 7, 2004, Fowlkes continued to have a shopping impulsion, sleeping problems, and depressive symptoms (AR. 246). She met with her doctor twice that month to monitor these symptoms (AR. 245-246). Fowlkes also continued to take Lamictal, Effexor, and Seroquel prescriptions (AR. 245).

In early December, Fowlkes had no depressive or manic symptoms and her mood was good (AR. 244). Dr. Jain scheduled Fowlkes' next couple appointments in six week increments (AR. 243-244). In January 2005, Fowlkes reported she was feeling less moody and doing well emotionally, with no depressive or manic symptoms (AR. 243). Similarly, on March 1, 2005, she reported her "mood symptoms were under control" (AR. 242). Her medication was continued at the same dosage (AR. 242).

On April 12, 2005, Fowlkes' mood became unstable and she reported having a manic phase where she spent a lot of money, her mind raced, and she occasionally cried (AR. 241). She reported she was ashamed of herself and was at the point of stuttering in the doctor's office (AR. 241). Dr. Jain adjusted Fowlkes' medication (AR. 241). One week later, Fowlkes reported she was doing better and had seen a doctor about pain associated with kidney stones (AR. 240). Dr. Jain again adjusted Fowlkes' medication (AR. 240). On May 2, 2005, Fowlkes felt "mentally comfortable" (AR. 239).

On May 16, 2005, Fowlkes had a better mood, but reported she suffered with a major anxiety attack the night before as she planned for her hip replacement surgery (AR. 238). On September 12, 2005, she reported she was "good emotionally" and had not suffered a panic attack since before her surgery (AR. 237; 319). She reported some feelings of depression and racing thoughts (AR. 319). Fowlkes' medication was adjusted (AR. 319). In October 2005, Fowlkes reported running out of her medication and that she had been unable to sleep for the entire weekend, but she was stable emotionally with panic attacks under control (AR. 317-318). On October 31, 2005, Fowlkes began meeting with a registered nurse, Ginger Brasuell (Ms. Brasuell) (AR. 317-318; 323). On December 1, 2005, she reported her mood was "O.K."; however, she had been feeling very tired and was tearful (AR. 315). Ms. Brasuell noted Fowlkes was stable on her medications (AR. 315).

6

In January 2006, Fowlkes reported she went on a shopping spree, was having mood swings, and was not doing well overall (AR. 345). At that time, Fowlkes also reported her adopted son was being evaluated for seizures and schizophrenia (AR. 345). In February 2006, Fowlkes was stable on her medication (AR. 344). However, in March 2006, Fowlkes reported she felt depressed and had water retention (AR. 343). Ms. Brasuell talked to Fowlkes about seeing a therapist about her depression (AR. 343). On April 24, 2006, Fowlkes reported being depressed; she also reported having spending issues and memory problems (AR. 342). Fowlkes stated she did not have time to go to therapy (AR. 342). By May 2006, Fowlkes reported feeling nervous all the time and like she was in a fog, and having a "rushing heart," anxiety, and insomnia (AR. 340). At this time, Ms. Brasuell noted Fowlkes was not doing well (AR. 340-341).

On June 15, 2006, Fowlkes reported she kicked her son out of the house and as a result was "feeling lots better" (AR. 339). Ms. Brasuell observed Fowlkes was "doing very well" (AR. 339). However, in July 2006, Fowlkes allowed her son to move back in and stated she suffered from panic attacks and poor sleep (AR. 338). Ms. Brasuell observed Fowlkes was "pretty depressed" and "not doing well" (AR. 338). Ms. Brasuell advised Fowlkes to use Benadryl to help her sleep (AR. 338).

By August 2006, Fowlkes reported she was doing so well that she wanted to get off all of her medication (AR. 337). She reported she could cry at the drop of a hat but otherwise felt good (AR. 337). Fowlkes' adopted son went to Job Corps (AR. 337). Ms. Brasuell observed Fowlkes was "fairly stable" but depressed, and Fowlkes talked about stressors in her life (AR. 337). Similarly, in September 2006, Fowlkes reported having lots of stressors in her life and appeared edgy (AR. 336). By October, Fowlkes reported feeling "O.K." but suffering from restless leg syndrome (AR. 335). Ms. Brasuell observed Fowlkes was still depressed and "not doing well" (AR 335). Ms. Brasuell prescribed medication for the restless leg syndrome and advised Fowlkes to continue therapy (AR. 335).

In December 2006, Fowlkes was doing well and asked for help to wean off of Effexor (AR. 334). Ms. Brasuell changed Fowlkes' medications to include Topamax (AR. 334). On February 21, 2007, Fowlkes appeared tired and Ms. Brasuell noted Fowlkes was "not doing well" because of "lots of stressors" in her life (AR. 333). Similarly, on July 13,

2007, Ms. Brasuell observed Fowlkes was not doing well due to the stressors in her life (AR. 332). She had not slept in weeks and was stressed, upset, and irritable (AR. 332). Fowlkes reported she had not been taking one of her medications for a couple weeks and her son had come home (AR. 332). Ms. Brasuell recommended Fowlkes restart the discontinued medication (AR. 332).

Also on July 13, 2007, Ms. Brasuell completed a medical source statement relating to Fowlkes' mental health (AR. 322-324). Ms. Brasuell reported she had treated Fowlkes since October 31, 2005 (AR. 323). She noted that Fowlkes had moderate impairments in her abilities to understand and remember simple instructions and moderate impairments in her ability to carry out simple instructions (AR. 322). Ms. Brasuell opined Fowlkes had "marked" impairments in four areas including her ability to: (1) make judgments on simple work-related decisions; (2) understand and remember complex instructions; (3) carry out complex instructions; and (4) make judgments on complex work-related decisions (AR. 322). Ms. Brasuell wrote, "this lady suffers from chronic, persistent mental illness and is not stable" (AR. 322). Ms. Brasuell noted Fowlkes suffered from racing thoughts, insomnia, irritability, and mood swings (AR. 323). According to Ms. Brasuell, Fowlkes has moderate impairments in her ability to interact appropriately with the public, supervisors, and co-workers; and to respond appropriately to usual work situations and to changes in a routine work setting, because of her mental illness (AR. 323).

## B.    Administrative Hearing

At the administrative hearing on July 26, 2007, Fowlkes testified she suffers from bipolar disorder and takes three medications for the disorder on a daily basis (AR. 383). The medications seem to help unless Fowlkes suffers a manic episode, then no medications really help (AR. 383). Fowlkes testified she sees Ms. Brasuell from 15 minutes to an hour, usually once a month (AR. 384). The frequency of the visits changes depending on the effectiveness of the medications (AR. 384-385). However, Fowlkes testified she does not see a mental health counselor because her insurance does not pay for one (AR. 384).

At the administrative hearing on February 4, 2008,[3] Fowlkes testified her medication makes her very tired (AR. 392). Fowlkes testified her condition is worsened by cold, "dumpy weather," and noise (AR. 392). Fowlkes has a driver's license and had driven herself to the hearing (AR. 392). Fowlkes reported she drives her van every day (AR. 393). The farthest Fowlkes has driven since July 2003, is from her home in Bayard, Nebraska, to Ft. Collins, Colorado, but she normally has someone with her to help drive (AR. 393).

Fowlkes testified she normally starts her day at 6:30 a.m. to prepare her children for school (AR. 394). Fowlkes makes breakfast for herself and the children, then takes the children to school (AR. 394). When the children are at school, Fowlkes listens to the radio, cleans house, and talks on the telephone (AR. 394-395). After school, Fowlkes picks up the children, feeds the children dinner, watches television, then prepares for bedtime between 8:00 and 8:30 p.m. (AR. 395). When suffering from mania, Fowlkes testified she gets approximately three hours of sleep (AR. 396). Otherwise, Fowlkes sleeps from 8:00 p.m. until 6:30 a.m. (AR. 396). Fowlkes testified that when her husband is in town, they socialize by eating out or visiting with friends (AR. 396).

Fowlkes is able to dress herself, brush her own hair, and apply her own make-up (AR. 396-397). Fowlkes does the food and other shopping for her household (AR. 397). Fowlkes does her own laundry with her washer and dryer located in the basement of her home (AR. 397). However, Fowlkes testified she does not walk on stairs very well due to her hip problems (AR. 397). Fowlkes does vacuuming occasionally, makes the beds, and mops the floors (AR. 397-398). Fowlkes does outside yard work like planting flowers, but she does not mow the lawn (AR. 398). Fowlkes swims with her children in the summer months (AR. 398). Fowlkes attends her children's school activities (AR. 398). Fowlkes likes to read for leisure (AR. 398-399). Fowlkes likes to be outside during the summer including camping with her family (AR. 398-399).

Fowlkes testified she can sit for about an hour or hour and a half, if she is able to shift her position (AR. 399). For example, Fowlkes is able to sit through a movie (AR. 399). Similarly, Fowlkes testified she can stand for the same period of time (AR. 399). Fowlkes

---

[3] The hearing was continued when the ALJ determined Fowlkes' mental health records were incomplete (AR. 385-386).

can walk for about twenty minutes before she needs to stop and take a break (AR. 399). Fowlkes can safely lift and carry forty pounds (AR. 399). Fowlkes has no problems with her arms or shoulders and can manipulate small objects (AR. 400). Fowlkes sometimes has problems with her balance when carrying items (AR. 400). Fowlkes occasionally uses a cane or crutches when her hip is sore (AR. 400-401). Fowlkes did not use anything to help her walk on the day of the hearing (AR. 401). Fowlkes can walk up and down stairs (AR. 401). Fowlkes can reach for things down low, on her same level, or above her head (AR. 401). Fowlkes testified that some days she has difficultly functioning mentally, for example when she has a panic attack, she feels as if she might have a heart attack (AR. 401). At those times, she has difficulty calming her children (AR. 401). Fowlkes explained the medication helps a lot, but there are days that it does not help (AR. 402).

Dr. Michael Enright, a clinical psychologist, testified as an impartial mental health expert at the hearing (AR. 402). Dr. Enright reviewed Fowlkes' file and stated there was sufficient objective medical evidence in the record for him to form an opinion about Fowlkes' mental health status (AR. 402-403). Dr. Enright concluded Fowlkes does have two medically identified impairments – Affective Disorder (Listing 12.04) and Anxiety Related Disorder (Listing 12.06) (AR. 403). However, Dr. Enright testified Fowlkes' impairments do not precisely satisfy the diagnostic criteria for either bipolar I disorder or panic attacks without agoraphobia (AR. 403). Dr. Enright testified that, with the impairments combined, under the B criteria for numbers one through four Fowlkes scored mild, moderate, none, and none, respectively (AR. 403). Dr. Enright determined the evidence does not support the presence of C criteria (AR. 403). Based on these impairments, Dr. Enright determined Fowlkes has the following work limitations based on her mental health: simple, routine, repetitive work with only occasional face-to-face involvement with the public (AR. 404). Dr. Enright indicated his opinion is based on the records, which indicate Fowlkes' treatment has primarily been limited to medication reviews that have become less frequent over time because Fowlkes has been "pretty stable on her medications" (AR. 404). Dr. Enright stated Fowlkes has been compliant with her medication regime, which appears appropriate based on her diagnoses for bipolar disorder and depression (AR. 406-407). Dr. Enright also relied on the information that Fowlkes has

10

not had any episodes of decompensation (AR. 404). Dr. Enright also noted the record shows that Fowlkes reported having difficult times, but these were primarily associated with family members and other problems not associated with her impairments (AR. 406).

William Tysdal, who is a Vocational Rehabilitation Counselor, testified at the hearing as an impartial vocational expert (VE) (AR. 407). The VE reviewed Fowlkes' file and heard the testimony presented during the hearing (AR. 407-408). The VE needed no other information to enable him to form an opinion in the case (AR. 408). The ALJ posed a hypothetical question to the VE that assumed an individual of Fowlkes' age, education, and work experience, who was limited to work at the sedentary level in terms of lifting and carrying (AR. 408). In addition, the individual could stand or walk about six hours in an eight hour work day and sit for about six hours in an eight hour day, with normal breaks (AR. 408-409). Further, the individual should be allowed to work where she could alternate between sitting or standing and walking every hour (AR. 409). The individual could push or pull as might be needed to operate hand or foot controls at the same level as her ability to lift or carry (AR. 409). The individual should only occasionally have to go up or down stairs, but could not go up or down ladders, ropes, or scaffolds (AR. 409). The individual could frequently balance, but could only occasionally stoop, kneel, crouch, or crawl (AR. 409). The individual should not be exposed to extreme cold, dampness and humidity, noise, or unprotected heights (AR. 409). The work should also be limited to simple, routine, repetitive work with only occasional face-to-face involvement with the public (AR. 409). The VE opined such an individual would be incapable of performing Fowlkes' past relevant work (AR. 409). However, such a person could perform sedentary unskilled occupations, or SVP 2 (AR. 409). A representative example of such occupations includes a call out operator, information clerk, survey worker, and office helper (AR. 410-411). These occupations have 3,400 existing positions in Nebraska, South Dakota, and Wyoming (AR. 409-411). These occupations would also be appropriate for an individual who was limited to a light exertional level limited in lifting and carrying (AR. 410).

As part of Fowlkes' application for benefits, Dr. Daniel L. Scharf, a licenced psychologist, conducted a consultative psychological evaluation of Fowlkes on September 27, 2005 (AR. 305-308). Fowlkes presented as "friendly and cooperative," "well groomed,"

11

and using a walking cane (AR. 305).  Dr. Scharf reported Fowlkes had driven herself twenty miles to the interview (AR. 305).  Fowlkes reported to Dr. Scharf that Fowlkes had worked until approximately 3 1/2 years previous to the interview as a night manager, a job she quit "after having her youngest daughter placed in the home" (AR. 306).  Fowlkes also reported her bipolar disorder interferes with her working due to fatigue, mood swings, and depression (AR. 305).  Fowlkes described a pattern of relatively sustained mood swings (AR. 306).  Specifically, Fowlkes reported, that during manic phases, she goes on shopping sprees and becomes irritable with less need for sleep (AR. 306).  In contrast, Fowlkes reported becoming withdrawn, having crying spells, and feeling suicidal during depressed phases (AR. 305).  Fowlkes cried during the interview and reported she cried more frequently since she stopped taking the medication Effexor (AR. 307).  Fowlkes reported she has had panic attacks in the past, but had not suffered a panic attack for approximately eight months (AR. 307).  Fowlkes described her panic attacks as typically occurring late at night and lasting from thirty to forty-five minutes (AR. 307).  Fowlkes acknowledged she is getting better at controlling these attacks (AR. 307).  Fowlkes reported she has noticed an improvement in her symptoms with medication and counseling (AR. 307).  Fowlkes reported undergoing counseling one to two times each month (AR. 307).  Fowlkes has not been hospitalized for her psychiatric difficulties (AR. 307).

Dr. Scharf assessed Fowlkes with GAF score of 55 (AR. 308).[4]  Dr. Scharf determined Fowlkes' prognosis for her mood disorder and anxiety was good because she has benefitted from treatment and seems able to contain her symptoms (AR. 308).  Dr. Scharf concluded Fowlkes could sustain concentration and attention necessary for task completion; could understand, remember, and carry out short and simple instructions under ordinary supervision; and could probably adapt to changes in her environment; but might have some difficulty relating appropriately to co-workers and supervisors (AR. 307).

On October 24, 2005, a medical consultant filled out a mental residual functional capacity assessment form based on Fowlkes' bipolar disorder (AR. 163-165) and a

---

[4] A GAF of 51 through 60 is characterized by moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).  **See** DSM-IV-TR at 34.

Psychiatric Review Technique form (AR. 167-180).  In the assessment, the consultant indicated Fowlkes was markedly limited in her ability to understand and remember instructions and her ability to carry out detailed instructions (AR. 163).  The examiner indicated Fowlkes was only moderately limited or had no limitations in all other areas, including the ability to interact appropriately with the general public (AR. 163-164).

### THE ALJ'S DECISION

The ALJ concluded Fowlkes was not disabled under the Act from July 31, 2003, through the date of the decision (AR. 14).  Accordingly, the ALJ determined Fowlkes was not entitled to any disability benefits or SSI (AR. 28).  The ALJ framed the issues as:  1) whether Fowlkes was disabled under sections 216(i), 223(d), and 1614(a)(3)(A) of the Act; and 2) whether Fowlkes met the insured status requirements of sections 216(i) and 223 of the Act (AR. 14).  With respect to the second issue, the ALJ found Fowlkes remained insured through September 30, 2005, and must establish disability on or before that date to be entitled to a period of disability and disability insurance benefits (AR. 14, 20).  As noted by the ALJ, the Act defines "disability" as an inability to engage in any substantial gainful activity due to any medically determinable physical or mental impairment or combination of impairments (AR. 14).  **See** 42 U.S.C. § 423(d)(1)(A) (2004); 20 C.F.R. § 404.1505.  These impairments must be expected to result in death or must last for a continuous period of at least 12 months.  *Id.*

The ALJ must evaluate a disability claim according to the sequential five-step analysis prescribed by the Social Security regulations.  ***Flynn v. Astrue***, 513 F.3d 788, 792 (8th Cir. 2008); 20 C.F.R. § 404.1520(a)(4).

> During the five-step process, the ALJ considers (1) whether the claimant is gainfully employed, (2) whether the claimant has a severe impairment, (3) whether the impairment meets the criteria of any Social Security Income listings, (4) whether the impairment prevents the claimant from performing past relevant work, and (5) whether the impairment necessarily prevents the claimant from doing any other work.

***Goff v. Barnhart***, 421 F.3d 785, 790 (8th Cir. 2005) (quotation omitted).  More specifically, the ALJ examines:

[A]ny current work activity, the severity of the claimant's impairments, the claimant's residual functional capacity and age, education and work experience. **See** 20 C.F.R. § 404.1520(a); *Braswell v. Heckler, 733 F.2d 531, 533 (8th Cir. 1984).* If the claimant suffers from an impairment that is included in the listing of presumptively disabling impairments (the Listings), or suffers from an impairment equal to such listed impairment, the claimant will be determined disabled without considering age, education, or work experience. **See** *Braswell, 733 F.2d at 533.* If the Commissioner finds that the claimant does not meet the Listings but is nevertheless unable to perform his or her past work, the burden of proof shifts to the Commissioner to prove, first, that the claimant retains the residual functional capacity to perform other kinds of work, and, second, that other such work exists in substantial numbers in the national economy. **See** *Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000).* A claimant's residual functional capacity is a medical question. **See** *id. at 858.*

*Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).* "If a claimant fails to meet the criteria at any step in the evaluation of a disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart, 433 F.3d 575, 577 (8th Cir. 2006)* (quotation omitted)).

In this case, the ALJ followed the appropriate sequential analysis. The ALJ reviewed the record and found Fowlkes had not engaged in any type of substantial and gainful work activity since July 31, 2003 (AR. 20). Next, the ALJ found Fowlkes had impairments considered severe under the Social Security regulations including: a history of osteoarthritis and right hip replacement, a bipolar disorder, and panic attacks without agoraphobia (AR. 20).

At step three, the ALJ determined Fowlkes did not have an impairment or combination of impairments that meets or medically equals one of the impairments described in the Listings of Impairments at 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926) (AR. 20-22). Specifically, the ALJ observed Fowlkes' mental impairments caused mild or moderate restrictions of activities of daily living; mild or moderate difficulties in maintaining social functioning; mild or moderate difficulties in maintaining concentration, persistence or pace; and zero, one or two episodes of decompensation of extended duration, depending on the

evaluator (AR. 21).  Because Fowlkes did not have at least two marked limitations or one extreme limitation or three or more repeated episodes of decompensation, the ALJ found the "paragraph B" criteria were not met (AR. 21).  Similarly, the ALJ found the evidence did not establish the presence of "paragraph C" criteria, which was consistent with the assessments of two clinical psychologists and two psychological medical experts (AR. 21). The ALJ noted Fowlkes' osteoarthritis, hip replacement and related symptoms were not associated with the inability to ambulate effectively, nor did they constitute a major dysfunction of the joints (AR. 20-21).

The ALJ proceeded to step four to determine Fowlkes' residual functional capacity (RFC) (AR. 22-26).  In assessing RFC, the ALJ "emphasized" his conclusions are consistent with Fowlkes' testimony and reported activities (AR. 22).  The ALJ explicitly stated he considered all of Fowlkes' symptoms and the extent to which the symptoms could reasonably be accepted as consistent with the objective medical and other evidence, based on the requirements of 20 C.F.R. §§ 404.1529 and 416.929, and Social Security Rulings (SSR) 96-4p and 96-7p (AR. 22).  The regulations and SSRs cited by the ALJ list factors to consider when determining the claimant's credibility.  The ALJ found Fowlkes' allegations concerning her impairments and their impact on her ability to work were not entirely credible (AR. 23).  Specifically, the ALJ noted Fowlkes' sporadic work history prior to the onset of her disability, which raises the question about whether the "continuing unemployment is truly due to any medical impairment" (AR. 23).  Additionally, the ALJ noted inconsistencies between Fowlkes' testimony and earlier reports of impairments (AR. 23-24).  Moreover, the ALJ discussed the discrepancy between Fowlkes' reported daily activities and the complaints of disabling symptoms (AR. 23-24).  Finally, Fowlkes received little medical care around the time of her alleged onset date (AR. 24).

In addition to the findings about Fowlkes' credibility, the ALJ accorded lesser weight to Ms. Brasuell's opinions than to acceptable medical sources, finding Ms. Brasuell's opinions would be considered as an "other source," but were not consistent with the medical evidence including her own counseling notes (AR. 25-26).  In contrast, the ALJ concluded five psychologists' opinions, which were different from Mr. Brasuell's opinions, were consistent with the medical evidence and Fowlkes' own reported activities of daily

living (AR. 26).  The ALJ found Dr. van Egeraat's opinions were not entitled to controlling weight because the opinions were not well-supported by medically acceptable clinical and laboratory diagnostic techniques, treatment ended in 2005, and other contradictory substantial evidence including the claimant's own testimony (AR. 24-25).  Further, the ALJ noted Dr. Jain's GAF score for Fowlkes, but provided no other comments about Dr. Jain (AR. 25).  The ALJ accorded substantial weight to Dr. Enright's opinions (AR. 25).

Based on the ALJ's consideration of the record, the ALJ found Fowlkes has an RFC for a light exertional level of work, as follows.

> can stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday, and sit (with normal breaks) for a total of about 6 hours in an 8-hour workday, but should be allowed to alternate between sitting and standing/walking every hour or so if need be, who is unlimited in push and/or pull activities (including operation of hand and/or foot controls) other than as stated above for lift and/or carry, occasionally climb ramps and stairs but should not be required to climb ladders, ropes or scaffolds, frequently balance, occasionally stoop, kneel, crouch, and crawl, who should not be subjected to concentrated exposure to extreme cold, dampness, humidity, or noise, and should not be subjected to hazards of the workplace such as unprotected heights, dangerous machinery, and things of that nature, who is limited to work which is simple, routine and repetitive in nature, and should involve no more than occasional face-to-face contact with the general public.

The ALJ further determined, because of Fowlkes' medically determinable impairments, Fowlkes can no longer perform her past relevant work, but could perform sedentary light exertional unskilled occupations such as survey worker, office helper, call-out operator, and telephone information clerk, which exist in her region in significant numbers (AR. 22, 26-28).  Therefore, the ALJ found Fowlkes is not under a disability as defined by the Act (AR. 28).

Fowlkes appeals the ALJ's findings on two related grounds.  Fowlkes contends the ALJ failed to accord appropriate weight to the opinions of Fowlkes' mental health providers, Dr. Vivek Jain and Ginger Brasuell, APRNC.  **See** Filing No. 18 - Brief p. 10.  Specifically, Fowlkes contests whether the ALJ properly supported his findings that Dr. Jain's November 21, 2003, psychiatric evaluation (AR. 258-261) and Ms. Brasuell's July 13, 2007, medical

source statement (AR. 322-324) were not entitled to controlling weight.  The court will address each issue below.

## STANDARD OF REVIEW

A district court is given jurisdiction to review a decision to deny disability benefits according to 42 U.S.C. § 405(g).  A district court is to affirm the Commissioner's findings if "supported by substantial evidence on the record as a whole."  *Clevenger v. Soc. Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009).  "[I]t is the court's duty to review the disability benefit decision to determine if it is based on legal error."  *Nettles v. Schweiker*, 714 F.2d 833, 835-36 (8th Cir. 1983).  Questions of law are reviewed *de novo*.  **See** *Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999).  Findings of fact are considered conclusive if supported by substantial evidence on the record as a whole.  **See** *Nettles*, 714 F.2d 833.  Furthermore, "[the court] defer[s] to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence."  *Pelkey v. Barnhart*, 433 F.3d 575, 578 (8th Cir. 2006) (**quoting** *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); **see also** *Burress v. Apfel*, 141 F.3d 875, 878 (8th Cir. 1998) (noting "substantial evidence in the record as a whole" standard is more rigorous than the "substantial evidence" standard).

"Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision."  *Juszczyk v. Astrue*, 542 F.3d 626, 631 (8th Cir. 2008); **see** *Pelkey*, 433 F.3d at 577.  "In reviewing the record, the court must consider both evidence that supports and evidence that detracts from the Commissioner's decision."  *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (internal quotations and citation omitted).  The reviewing court "will not reverse simply because some evidence may support the opposite conclusion."  *Pelkey*, 433 F.3d at 578.  "Whether the record supports a contrary result or whether we might decide the case differently is immaterial."  *Tellez v. Barnhart*, 403 F.3d 953, 956 (8th Cir. 2005); **see** *Bradley v. Astrue*, 528 F.3d 1113, 1115 (8th Cir. 2008).

**DISCUSSION**

A.    **Dr. Vivek Jain**

Fowlkes argues the ALJ applied an improper legal standard when evaluating Dr. Jain's opinions by affording greater weight to another source.  Rather, Fowlkes argues Dr. Jain's November 21, 2003, psychiatric evaluation should be accorded controlling weight because Dr. Jain was a treating source, who had treated Fowlkes for two years.  Further, Fowlkes contends the ALJ failed to provide adequate, or any, support for the decision to give Dr. Jain's opinion less than controlling weight.

Under the regulations, the ALJ must determine the weight to give a particular source's testimony based on a set of criteria.  The ALJ is to consider whether an examining or treating relationship existed; the length, frequency and nature of any treatment; whether the medical opinions are supported by objective and other evidence; the consistency of the medical opinion with the record as a whole; and the medical specialization of the doctor giving the opinion.  **See** 20 C.F.R 404.1527; SSR 96-2p, 1996 WL 374188, at *4 (Social Security Administration, July 2, 1996) (SSR 96-2p).  "A treating physician's medical opinion is given controlling weight if that opinion is 'well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record.'"  **Choate v. Barnhart**, 457 F.3d 865, 869 (8th Cir. 2006) (alteration in original) (**quoting** 20 C.F.R. § 404.1527(d)(2)); **see Robson v. Astrue**, 526 F.3d 389, 393 (8th Cir. 2008).  "These opinions are not automatically controlling, however, because the record must be evaluated as a whole."  **Choate**, 457 F.3d at 869 (**citing Reed v. Barnhart**, 399 F.3d 917, 920-21 (8th Cir. 2005)).  "[The court] will uphold an ALJ's decision to discount or even disregard the opinion of a treating physician where 'other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  **Choate**, 457 F.3d at 869 (**quoting Reed**, 399 F.3d at 920-21).  Further, "a treating physician's opinion deserves no greater respect than any other physician's opinion when the treating physician's opinion consists of nothing more than vague, conclusory statements."  **Charles v. Barnhart**, 375 F.3d 777, 783 (8th Cir. 2004). However, the regulations require "that the [ALJ] will always give good reasons in the notice

18

of the determination or decision for the weight given to a treating source's medical opinion(s), *i.e.*, an opinion(s) on the nature and severity of an individual's impairment(s)." SSR 96-2p; **see** 20 C.F.R. §404.1527(d)(2); *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000).  As part of the overall evaluation of a claimant's allegations, an ALJ must weigh the medical opinions of record and resolve any conflicts among the opinions of the various treating and examining physicians. **See** 20 C.F.R. §§ 404.1527, 416.927; *Jenkins v. Chater*, 76 F.3d 231, 233 (8th Cir. 1996).

According to the ALJ's decision, the ALJ considered Dr. Jain's assessment of Fowlkes (AR. 25).  The ALJ explicitly recognized Dr. Jain assessed Fowlkes with a GAF score of 50 (AR. 25, 261).  The ALJ's decision does not contain evidence or commentary that the ALJ rejected Dr. Jain's opinion about the GAF.  Fowlkes does not indicate, which, if any, of Dr. Jain's other opinions contradict the ALJ's decision.  The ALJ did not mention Dr. Jain's other opinions, which appear limited by the nature of the document itself.

The ALJ's decision notes Dr. Scharf assessed Fowlkes with a GAF of 55 in a psychological report dated October 11, 2005 (AR. 25; 308).  However, the ALJ does not give greater weight to one or the other GAF score.  The ALJ notes both scores in conjunction with other record evidence as support for Dr. Enright's opinion.  The ALJ's decision explicitly states he gave substantial weight to the opinion of Dr. Enright, a clinical psychologist who testified as an impartial mental health expert at the hearing (AR. 25; 402).  Dr. Enright's opinion, relied upon by the ALJ, is that Fowlkes was able to engage in simple work, routine and repetitive in nature, and should only have occasional face-to-face contact with other persons (AR. 25).  Moreover, the ALJ's decision is consistent with other substantial evidence in the record, Fowlkes' own testimony, and reports concerning Fowlkes' impairments and their impact on her ability to work (AR. 23-25).

Though Dr. Jain's GAF score indicates Fowlkes may have a serious impairment,[5] Dr. Jain's psychiatric evaluation does not explain the score (AR. 261).  More importantly, Dr. Jain stated Fowlkes did not exhibit some of the symptoms characterized by a GAF within the range of 41 to 50.  Specifically, Dr. Jain noted Fowlkes denied having suicidal

---

[5] **See** note 2, *infra*.

ideations, but did have good social relationships (AR. 260). Further, the GAF of 50 is at the top of the range for the functional level nearest the range assessed by Dr. Scharf. Finally, the ALJ need not accord controlling weight to a treating source's opinion if the opinion is not well-supported or is inconsistent with other substantial evidence in the record. **See** *Clevenger v. Social Sec. Admin.*, 567 F.3d 971, 974 (8th Cir. 2009); *Rogers v. Chater*, 118 F.3d 600, 602 (8th Cir. 1997) ("The opinion of a treating physician can be discounted if other assessments are supported by better or more thorough medical evidence."). Accordingly, assuming the ALJ did disregard Dr. Jain's GAF assessment, the action was permissible based on the lack of foundation for the assessment and its inconsistency with other record evidence. In any event, the ALJ was not bound to consider the GAF score as indicative of Fowlkes' RFC. **See** *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 241 (6th Cir. 2002) ("While a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy."). For these reasons, the ALJ was justified in handling Dr. Jain's opinions as he did.

### B.    Ginger Brasuell, APRNC

Fowlkes argues the ALJ improperly found Ms. Brasuell's opinion would not be considered as a medical opinion. Fowlkes argues a ruling from the SSA allows ALJs to give greater weight to a nurse practitioner's opinion, even though she is not an "acceptable medical source." Fowlkes contends Ms. Brasuell's opinion should have been accorded greater weight because Ms. Brasuell treated Fowlkes on a monthly basis for several years and was most familiar with Fowlkes' mental illness and its effect on Fowlkes' daily life. Furthermore, Ms. Brasuell continually changed Fowlkes' medications and kept notes regarding Fowlkes' condition.

Under the Social Security regulations, "[a person] can only be found disabled if [she is] unable to do any substantial gainful activity by reason of any medically determinable physical or mental impairment." 20 C.F.R. § 404.1527(a)(1). Such "impairment must result from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* Evidence obtained or submitted may contain "medical opinions," which "are statements from physicians and

psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the] impairment(s)." *Id.* § 404.1527(a)(2).

The SSA recognizes two types of sources for evidence that may be used to establish an impairment or the severity of an impairment:  "acceptable medical sources" and "other sources."  **See** 20 C.F.R. § 404.1513(a) & (d).  Acceptable medical sources include:  licensed physicians, psychologists, optometrists, podiatrists, and pathologists.  **See** *id.* § 404.1513(a).  "Other sources" are divided into two categories:  "medical sources" and "non-medical sources."  **See** *id.* § 404.1513(d).  Nurse practitioners are listed as medical sources under "other sources" and are not considered "acceptable medical sources."  **See** *id.*

On August 9, 2006, the SSA issued SSR 06-3p to clarify how the SSA considers opinions from acceptable medical sources and non-acceptable medical sources.  Three reasons exist for the distinction between medical sources.  **See** 71 Fed. Reg. 45593-03. First, "to establish the existence of a medically determinable impairment," evidence must be from an acceptable medical source.  *Id.* at 45594.  In contrast, "[i]nformation from [sources other than 'acceptable medical sources'] **cannot establish the existence of a medically determinable impairment**."  *Id.* (emphasis added).  Second, only acceptable medical sources can provide "medical opinions."  **See** *id.*  "Third, only 'acceptable medical sources' can be considered treating sources whose medical opinions may be entitled to controlling weight."  *Id.* (internal citation omitted).

The SSA recognized that "[w]ith the growth of managed health care . . . and the emphasis on containing medical costs, medical sources who are not 'acceptable medical sources,' such as nurse practitioners . . ., have increasingly assumed a greater percentage of the treatment and evaluation functions previously handled primarily" by acceptable medical sources.  **See** 71 Fed. Reg. 45593-03.  "[I]nformation from such "other sources" may be based on special knowledge of the individual and may provide insight into the severity of the impairment(s) and how it affects the individual's ability to function."  *Id.* at 45594.  Therefore, "[o]pinions from [nurse practitioners], who are not technically deemed 'acceptable medical sources' under [the SSA's] rules, are important and should be

evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." *Id.* at 45595.

> [D]epending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an "acceptable medical source" may outweigh the opinion of an "acceptable medical source," including the medical opinion of a treating source. For example, **it may be appropriate to give more weight to the opinion of a medical source who is not an "acceptable medical source" if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion**.

*Id.* at 45596 (emphasis added).

In general, according to SSR 06-3p, the factors for considering opinion evidence from an "other source" include: (1) how long and how frequently has the source known and seen the individual; (2) whether an opinion is consistent with other evidence; (3) the relevant evidence supporting the opinion; (4) whether the source has an area of expertise related to the individual's impairment; and (5) any other evidence in the record supporting or refuting the opinion. **See** *id.* at 45595. Moreover, an opinion from a medical source can be accorded greater weight simply because it is from a source who is the most qualified health care professional. **See** *id.* Finally, SSR 06-3p does not change the regulation that provides, "Medical opinions are statements from physicians and psychologists or other 'acceptable medical sources.'" *Id.* (**citing** 20 C.F.R. § 404.1527(a)(1)).

Furthermore, a nurse practitioner as health care provider who is not an acceptable medical source is generally not recognized as a "treating source" unless the nurse practitioner works with an acceptable medical source as a team. **See, e.g.**, *Haman v. Astrue*, 8:08CV416, 2009 WL 1846825, at *8-9 (D. Neb. June 26, 2009) (slip op.) (determining though therapist worked with an acceptable medical source during treatment, therapist was not considered a "treating source" for purposes of the Act); *Lacroix v. Barnhart*, 465 F.3d 881, 885-86 (8th Cir. 2006) (holding neither social worker nor nurse practitioner could be considered a treating source because record contained no reports or involvement by an acceptable medical source); *Tindell v. Barnhart*, 444 F.3d 1002, 1005

(8th Cir. 2006) (explaining licensed social worker could not be given treating source status because he was not associated with a physician, psychologist, or other acceptable medical source); **but see** *Shontos v. Barnhart*, 328 F.3d 418, 421 (8th Cir. 2003) (considering nurse practitioner a treating source who worked within a team that included an acceptable medical source). Therefore, in considering the evidence, the ALJ is not bound by the treating source regulations set forth in 20 C.F.R. 404.1527 when considering an opinion from a nurse practitioner. **See** *Tindell*, 444 F.3d at 1005; *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005).

Ms. Brasuell treated Fowlkes beginning on October 31, 2005, but notes Fowlkes had been treated by another provider previously (AR. 323). Ms. Brasuell provided Fowlkes with medication checks and some counseling on a monthly basis, or as needed (AR. 317; generally AR. 311-347). However, Ms. Brasuell recommended Fowlkes talk to a therapist about her depression (AR. 343). In a medical source statement dated July 13, 2007, Ms. Brasuell gave the opinion that Fowlkes "suffers from chronic, persistent mental illness and is not stable" (AR. 322). The ALJ considered Ms. Brasuell's opinion, but not as a medical opinion (AR. 26). The ALJ explicitly gave Ms. Brasuell's opinion lesser weight than medical opinions in the record (AR. 26). Although Ms. Brasuell opined Fowlkes had "marked" limitations in four areas (AR. 322), the ALJ concluded the opinions of five psychologists are more consistent with the medical evidence of record, Ms. Brasuell's counseling notes, Panhandle Mental Health Center counseling notes, and Fowlkes' own reported activities of daily living (AR. 26).

Fowlkes argues the ALJ failed to consider the evidence using SSR 06-3p, however the ALJ properly evaluated Ms. Brasuell's opinion with lesser weight because she is not an acceptable medical source. Accordingly, the ALJ properly categorized Ms. Brasuell's opinion not as a "medical opinion" under SSR 06-3p. Also, as provided in SSR 06-3p, the ALJ considered Ms. Brasuell's opinion in relation to the severity of Fowlkes' impairment in light of the record evidence.

The ALJ has discretion within the regulations to assign various weights to each opinion. The record evidence supports the ALJ's decision to consider Ms. Brasuell's opinion, but not as either a treating source or a medical opinion. Although Ms. Brasuell

treated the plaintiff since October 31, 2005, Ms. Brasuell is not consider a "treating source," as defined by the Act.  **See** 20 C.F.R. 404.1502.  Ms. Brasuell may have been considered a treating source, if she had worked on a "treatment team" with an "acceptable medical source."  **See** *Shontos*, 328 F.3d at 421.  The evidence shows Ms. Brasuell worked at Panhandle Mental Health Center, where Dr. Jain had worked, however Dr. Jain's treatment preceded Ms. Brasuell's treatment of Fowlkes.  There is no evidence in the record Ms. Brasuell worked with a treatment team.  Moreover, the ALJ properly categorized Ms. Brasuell's opinion as an "other source" because it is not a medical opinion from an "acceptable medical source," under the Act.

## CONCLUSION

For the reasons stated above, the court concludes the ALJ's decision, which represents the final decision of the Commissioner of the SSA, should not be reversed or remanded.  The ALJ's decision does not contain the errors alleged by Fowlkes. Specifically, substantial evidence in the record supports the ALJ's decisions with regard to the weight assigned to Dr. Jain's and Ms. Brasuell's opinions.  Accordingly, the Commissioner's decision is affirmed.

**IT IS ORDERED:**

The decision of the Commissioner is affirmed, the appeal is denied, and judgment in favor of the defendant will be entered in a separate document.

DATED this 2nd day of September, 2009.

BY THE COURT:

s/ Thomas D. Thalken
United States Magistrate Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.